# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

United States of America,       Criminal No. 08-04 (DWF/SRN)

     Plaintiff,

v.                **MEMORANDUM**
               **OPINION AND ORDER**

Jeffrey A. Siewert,

     Defendant.

_____

James E. Lackner and David J. MacLaughlin, Assistant United States Attorneys, United States Attorney's Office, counsel for Plaintiff.

Howard I. Bass, Esq., Bass Law Firm PLLC, counsel for Defendant.

_____

## INTRODUCTION

This matter is before the Court upon the motion of Defendant Jeffrey A. Siewert ("Defendant") to dismiss the indictment against him.  At issue in this case is whether information the Defendant provided pursuant to a grant of immunity was used in a subsequent criminal investigation of him leading to the charges in the indictment.  This matter was previously submitted to United States Magistrate Judge Susan Richard Nelson, who issued a Report & Recommendation recommending that the motion be denied.  This Court, however, vacated the Report & Recommendation by an order dated July 30, 2008, and held a *de novo* hearing on this matter on August 20, 2008.  The Court has considered the testimony of the witnesses and the parties' post-hearing briefs.  For

the reasons set forth below, this Court grants the Defendant's motion and dismisses the indictment.

## BACKGROUND

In 2002, Internal Revenue Service ("IRS") Special Agent John Tschida conducted an investigation into the criminal activities of Emery Gervais ("Gervais"). In the course of the Gervais investigation, Agent Tschida learned that Gervais was an associate of the Defendant. Agent Tschida executed a search warrant at the Defendant's home looking for two motorcycles he believed belonged to Gervais. At that time, the Defendant told Agent Tschida that he purchased the motorcycles from Gervais, in cash, using money he earned through a snow plowing business he pursued on the side. The Defendant also told Agent Tschida that he paid for his detached garage and vehicles, including his wife's vehicle, through his business, Sieco Construction ("Sieco"). Agent Tschida believed that the Defendant "was admitting that he . . . may have done a little bit of tax fraud there." (August 20 Hr'g Tr. at 24.)

Agent Tschida subsequently received a telephone call from Greg Schell ("Schell"), the Chief Financial Officer of Sieco. Schell informed Agent Tschida that Sieco had received compensation in cash receipts from Gervais for various construction jobs. The first job was a remodeling job performed for $35,508, and Schell indicated that this job was recorded correctly. The second job Schell reported to Agent Tschida involved building a deck and gazebo, for which Sieco received $24,599.28. Schell told Agent Tschida that the Defendant instructed him not to report this amount on Sieco's

2

books, and Schell indicated that the Defendant intended to skim this money. Schell reported to Agent Tschida that he did not keep this amount off the books, but instead recorded the receipt in a leasehold improvements account that he believed would be picked up for tax purposes on Sieco's return, and stated that he had not told the Defendant that he had accounted for this money.

Agent Tschida decided to interview the Defendant regarding these jobs as part of the Gervais investigation. Gervais had no job and no legitimate source of income, yet was making large cash payments to Sieco. Agent Tschida suspected Gervais obtained his money through narcotics trafficking and wanted to substantiate the facts regarding these cash outlays. Agent Tschida also suspected Gervais of engaging in money laundering in connection with cocaine dealing, and an informant had told Agent Tschida that Gervais supplied personal use amounts of cocaine to the Defendant. Agent Tschida was not interested in investigating the Defendant's tax evasion, however, because his focus was on Gervais. Agent Tschida also deemed the Defendant's activities to be too small to be worth pursuing.

The Defendant declined to speak with Agent Tschida without a grant of immunity. He was granted use and derivative use immunity via a proffer letter dated December 3, 2002, and agreed to be interviewed. The proffer letter states that "nothing [the Defendant] says during the interview, nor any leads derived from his statements, can be used against him for any criminal purposes." (Government ("Gov't") Ex. 4.) When the Defendant met with Agent Tschida for a proffer meeting a few days later, the Defendant

told Agent Tschida that Sieco did jobs for Gervais for which Gervais paid in cash.  The

Defendant told Agent Tschida about three separate jobs Sieco performed for Gervais,

including the remodeling job and deck and gazebo job described to Agent Tschida by

Schell.  The Defendant also told Agent Tschida that Sieco reshingled the roof on Gervais'

house for $3,500.  With respect to the deck and gazebo job and the roofing job, the

Defendant stated that Sieco did not report the income from these jobs because the

Defendant intended to skim the money and avoid taxation.  At a subsequent meeting

before Gervais' trial, the Defendant again confirmed that Sieco performed these three

jobs for Gervais.  Ultimately, Gervais pled guilty on the first day of his trial and the

Defendant did not testify against him.

　　　Agent Tschida subsequently received a telephone call from Schell who wished to

report to the IRS additional information about things that occurred when Schell worked at

Sieco.  Agent Tschida provided Schell with a telephone number for Revenue Agent

Michael Pittman in the IRS's revenue, or civil, investigation division.

　　　Revenue Agent Pittman received a call from Schell in April 2004.  Revenue Agent

Pittman filled out a Form 5346 reflecting that Schell called to report potential income tax

violations about which he became aware during his time at Sieco, including the failure to

report income, diversion of income in monetary form or in non-monetary form through

improvements to a residence, and deductions for personal expenses.[1]  Revenue Agent

Pittman testified that the primary issue identified in his conversation with Schell was the

---

[1]　　　The IRS uses Form 5346 to keep a record of information regarding potential tax
issues that are reported to it.

4

Defendant's improper deduction of personal expenses.  Schell also told Revenue Agent Pittman that a search warrant had been executed regarding another matter and that the Defendant instructed Schell to remove information from the computer system.  Revenue Agent Pittman forwarded the Form 5436 regarding this conversation to his supervisor, Wanda Gorell ("Gorell").  Revenue Agent Pittman was unaware that the Defendant had been granted immunity in the Gervais matter and was unaware of any statements the Defendant made pursuant to the grant of immunity.

Gorell evaluated the information provided by Revenue Agent Pittman and determined that she should appoint a revenue agent to do a "look-see . . . [to] look it over, [and] see if it has more value."  (August 20 Hr'g Tr. at 103.)  Gorell testified that she based this decision on her evaluation of Schell's credibility because Schell had been a bookkeeper at Sieco, worked there for some time, and had internal knowledge of the company.  Gorell assigned the file to Revenue Agent Nona Bosshart.  At this time, Gorell was not familiar with the Defendant or Sieco and was unaware that the Defendant had provided immunized information to the government.

Revenue Agent Bosshart began an investigation related to the year 2002.  She spoke to Schell, who told her that the Defendant paid for personal expenses, such as construction projects at his personal residence, through Sieco, and deducted them on the company's tax return.  Schell informed Revenue Agent Bosshart that he had spoken with Agent Tschida in connection with the Gervais case, that a search warrant had been executed at the Defendant's residence, that Sieco did work for Gervais, and that the

Defendant instructed Schell to remove information from the computer, but that Schell moved it to another account.

Revenue Agent Bosshart determined that she should move forward with the investigation of the Defendant and Sieco.  She began an audit and met with the Defendant and Frank Potochnik ("Potochnik"), the Chief Financial Officer of Sieco.[2]  During visits to Sieco, she found records of deductions that related to personal expenditures.  She asked the Defendant about personal expenditures and he admitted that he had personal expenses paid by the company, but he indicated that these payments were considered dividends.  Based on information from Schell, Revenue Agent Bosshart did not believe the Defendant was being truthful.  Revenue Agent Bosshart decided to expand her audit backwards to include the year 2001.

Just prior to making the decision to expand the audit, Revenue Agent Bosshart learned that the Defendant had given an immunized statement in another case.  Revenue Agent Bosshart testified before this Court that she learned of the immunized statement when she received a copy of the Defendant's proffer letter from Potochnik.[3]  Knowing that Agent Tschida had been involved in a matter regarding the Defendant, Revenue Agent Bosshart approached Agent Tschida to ask him about the immunity issue.  Agent

---

[2]     Potochnik replaced Schell at Sieco.

[3]     Revenue Agent Bosshart testified that when she appeared before Magistrate Judge Nelson during the prior hearing in this matter, she could not recall how she had learned of the Defendant's immunity deal.  At the hearing before this Court, Revenue Agent Bosshart stated that she had recently reviewed a file she received from Potochnik and that she discovered a copy of the letter in that file.

Tschida recommended that she contact Assistant United States Attorney Jeffrey Paulsen ("AUSA Paulsen"), who issued the proffer letter and was involved in the Gervais prosecution.

Agent Tschida testified before this Court that he did not remember whether he or Revenue Agent Bosshart raised the issue, but either way, Agent Tschida verified to Revenue Agent Bosshart that the Defendant had been granted immunity.  Agent Tschida indicated that he did not tell Revenue Agent Bosshart the content of the information the Defendant provided pursuant to his immunity deal.  Revenue Agent Bosshart informed AUSA Paulsen about the source of her investigation and indicated she had not read any reports of the Defendant's immunized interviews.  AUSA Paulsen advised her not to read any immunized interview reports and to document her independent sources of information.

During her investigation, Revenue Agent Bosshart discovered discrepancies between the timesheets of Sieco employees and job cards the company used to record work performed for billing.  She noted that in several instances the job numbers assigned for certain jobs appeared to have been used when employees were performing work unrelated to the specified job.  In some cases it appeared the work had been performed or goods shipped to the Defendant's home, and then the bill for the job was deducted on the Sieco tax return.  Revenue Agent Bosshart also discovered timesheets with work identified as "Emery's roof" and "Emery's/Rogers," for which there was no job card. (*Id*. at 138-139.)  The Defendant initially told her no work had been performed for

Gervais in 2001, but when confronted with the employee timesheets, the Defendant indicated Schell must not have filled out a job card or billed the job.  Revenue Agent Bosshart contacted Schell to find out his recollection and Schell indicated he did not remember the Gervais roofing job.

Revenue Agent Bosshart decided to refer the matter for criminal prosecution.  She completed a referral summary indicating that a roofing job was performed and that she believed the job had not been invoiced, but that the Defendant received cash for the job and kept it.  She testified before this Court that she included the Gervais roofing job in the prosecution referral because she believed that the unreported job was an indication that the Defendant committed tax fraud.  She also testified that at the time she referred the matter for prosecution, she knew of the Gervais roofing job solely by way of her review of Sieco's records and she had no knowledge of the content of the Defendant's immunized statements.[4]

The matter was accepted for criminal prosecution and assigned to Special Agent Marcus Lane, on his first day of work as an IRS agent.  Revenue Agent Bosshart met with Agent Lane to discuss the case on December 3, 2004.  Also present were both of their supervisors and Agent Lane's training officer, Agent Tim Nichols.  At this meeting, the group discussed the information Revenue Agent Bosshart included in her summary.

---

[4]     Revenue Agent Bosshart, in fact, testified that, as of the date of the hearing before this Court, she had no knowledge of the content of the Defendant's immunized statements.

Revenue Agent Bosshart testified to this Court that no one at the meeting discussed the content of an immunized statement by the Defendant.

Revenue Agent Bosshart, Agent Lane, and Agent Nichols met again on December 9, 2004, because Agent Lane had additional questions.  Agent Lane took handwritten notes regarding this meeting.  The notes have a question and answer format, and Agent Lane testified that he had written down questions he had for Revenue Agent Bosshart and that he "filled in the answers that [he] received from those questions."  (*Id.* at 198.)  At one point, Agent Lane's notes include the question:  "How did you find out about the unreported roofing job? Any others?"  Underneath this question, Agent Lane wrote: "During Testimony (in a previous case)."  (Gov't Ex. 16.)

Revenue Agent Bosshart testified before this Court that she did not tell Agent Lane about any testimony by the Defendant in a previous case, she was not aware that the Defendant gave testimony in the Gervais case, and that she had no knowledge of the content of anything the Defendant said in another case that she could have passed along to Agent Lane.  Revenue Agent Bosshart testified she did not know why Agent Lane had written down this description relating to the roofing job, but stated that she did not tell Agent Lane she learned about the Gervais roofing job from testimony in a previous case.

Agent Lane was asked at the hearing before this Court why he had written down information in his notes about testimony in a previous case in response to a question about the Gervais roofing job, and he testified:  "I don't specifically recall asking [Revenue Agent Bosshart] the question or what her exact answer was, so I can't elaborate

9

beyond what I have written there." (August 20 Hr'g Tr. at 198.) He also testified that Revenue Agent Bosshart had not told him that she knew information about items of the Defendant's income from a previous case and that they never discussed the content of any immunized statement given by the Defendant. Agent Lane, however, testified that he learned of the connection between his case and the Gervais case at the December 9 meeting with Revenue Agent Bosshart, that he found out about the Gervais investigation when he asked how she found out about the roofing job, and that "she knew that the roofing job had something to do with another investigation." (*Id*. at 216.)

Agent Lane testified he was unable to remember when he had learned of the Defendant's immunity agreement, but estimated that he learned of it in late 2004 or early in 2005.[5] He also testified, however, that he believed that he received a copy of the Defendant's immunity letter from Revenue Agent Bosshart between the first and second meetings with her in December 2004. He stated he had never read through the immunity agreement.

During his investigation, Agent Lane asked Agent Tschida about the link between the Defendant and Gervais. Agent Lane testified that Agent Tschida explained that a search warrant was executed because Agent Tschida believed that the Defendant was hiding motorcycles for Gervais, but that ultimately the IRS was unable to prove the motorcycles did not belong to the Defendant. Agent Lane testified Agent Tschida did not

---

[5]     All of the witnesses in this case provided detailed factual information regarding their investigation of the Defendant and Sieco, but their testimony about how and when they learned of the Defendant's immunized statement or discussed it with each other was more vague.

tell him about items of the Defendant's income or encourage him to take any action with respect to the investigation of Defendant.  Agent Lane testified that when he escalated the case into a formal criminal investigation, he was unaware of anything the Defendant had said under a grant of immunity.

Agent Lane decided he wished to interview Gervais in connection with his investigation of the Defendant because he had been unable to substantiate the facts related to the roofing job and talking to Gervais would firm up this item.  In May or June 2006, Agent Lane asked Agent Tschida if Gervais would agree to be interviewed and Agent Tschida told Agent Lane that Gervais was unlikely to talk.  Nonetheless, Agent Lane asked for Agent Tschida's memoranda regarding his interviews with the Defendant to review in order to prepare for the interview.

Agent Tschida printed out two documents for Agent Lane.  Agent Tschida testified that he intended to print his report regarding his interview with Schell and the report of the Defendant's statements at the time the search warrant was executed on the Defendant's home, which were non-immunized.  Instead, Agent Tschida printed two reports regarding the Defendant, the first of which related to the Defendant's statements at the time of the search warrant, and the second was the memorandum Agent Tschida prepared regarding the Defendant's statements made at the immunized proffer meeting.[6]

---

[6]     The IRS has no system for separating reports relating to immunized material from other materials.  Agent Tschida testified that the two reports were both stored in a folder on his computer related to the Gervais investigation and that the IRS does not flag or seal memoranda containing immunized statements.  Agent Tschida testified that the reports on

(Footnote Continued on Next Page)

Agent Tschida and Agent Lane testified that these reports printed out to a printer near Agent Lane's desk in the IRS's office.

Agent Lane testified that he picked up these reports from the printer, brought them to his desk, and placed them in a hanging folder in his cubicle. He testified he did not look at the reports. Agent Lane explained at the hearing that he did not immediately read the reports, stating "[a]t the time I was busy doing something else. It wasn't something I was going to look at immediately. It was something I would set down to tend to later." (*Id*. at 209.) Agent Lane testified that before he prepared for the interview, he learned that Gervais would not agree to speak with him and that this eliminated the need for him to read the reports from Agent Tschida.[7] Agent Tschida also testified that Agent Lane told him that Gervais refused to be interviewed and that Agent Lane indicated that he never read the reports.

Agent Lane testified that he learned there was an immunity issue with the reports later when he was told to give the reports to his supervisor. At this time, the reports had been in Agent Lane's possession for several months. Agent Lane testified he placed the reports in an envelope, handed the envelope to his supervisor without reading the reports,

---

(Footnote Continued From Previous Page)
his computer were also contained on a back-up drive and that only he and the computer technical staff of the IRS would have had access to the documents.

[7]     Agent Lane testified upon questioning by the Court that he did not intend to interview Gervais himself, but would have asked an agent from another IRS office to conduct the interview.

and that he had not had them in his possession since.  He testified that he never read the reports and that he never knew the contents of either one of them from another source.

## DISCUSSION

The government bears the burden of proof to show that the evidence it proposes to use in a criminal prosecution is "derived from a legitimate source wholly independent" of testimony compelled pursuant to a grant of immunity.  *Kastigar v. U.S.*, 406 U.S. 441, 460 (1972).  The government's burden is not limited to "a negation of taint," but is an affirmative duty the Supreme Court has characterized as a "heavy burden."  *Id*. at 460-61. The prohibition on the use of an immunized statement bars the use of compelled testimony as an "investigatory lead," and the use of "any evidence obtained by focusing investigation on a witness as a result of his compelled disclosures."  *Id*. at 460.

The Eighth Circuit holds impermissible both evidentiary and nonevidentiary uses of immunized testimony.  In the Eighth Circuit, the government is forbidden not only from the use of immunized testimony to present evidence to a jury, but also from all prosecutorial use of such statements.  *U.S. v. McDaniel*, 485 F.2d 305, 311 (8th Cir. 1973).  Such forbidden uses of immunized statements include obtaining "assistance in focusing the investigation, deciding to initiate prosecution, refusing to plea-bargain, interpreting evidence, planning cross-examination, and otherwise generally planning trial strategy."  *Id*.

The standard of review to be applied in a *Kastigar* hearing has not been firmly established in this circuit.[8]  The government urges the Court to adopt a preponderance of the evidence standard while the Defendant urges the Court to adopt the clear and convincing standard of proof.  The Court ultimately finds, however, that it is unnecessary to determine the standard or proof to be applied in *Kastigar* hearings because, under either standard, the government has failed to meet its burden here.

The issue in this case comes down to the question of whether Agent Lane's investigation of the Defendant was influenced by the immunized statement the Defendant gave in the Gervais case.  This is the only time the Defendant admitted having failed to report the cash he received from Gervais for the roofing job.  Two aspects of Agent Lane's investigation are of particular relevance:  the reference to testimony in a previous case in response to a question about the roofing job in Agent Lane's notes of the December 9 meeting with Revenue Agent Bosshart and his receipt and months-long possession of Agent Tschida's memorandum from the Defendant's immunized proffer meeting.

Revenue Agent Bosshart testified that she did not know of the content of the Defendant's proffer statement and that she did not convey any information from that statement to Agent Lane.  Her informant, Schell, did not know of this job, and her only knowledge of it came from her examination of the timesheets and job cards during her audit.  The Court found Revenue Agent Bosshart's testimony credible.  Agent Lane's

---

[8]    The Court ordered the parties to file briefs regarding this standard and received well-reasoned and informative briefs from both sides.

contemporaneous notes from that meeting, however, show that when he asked how the roofing job came to light, he did not write as the response that the information came from the audit or from the examination of timesheets and job cards. He instead wrote down that the knowledge arose from testimony in a previous case.

Agent Lane confirmed in his testimony to this Court that Revenue Agent Bosshart did not disclose to him the contents of any immunized statement. Yet Agent Lane also testified as follows:

> The first time that I learned that there had been a Gervais investigation was, I believe, during that second meeting with [Revenue Agent Bosshart] on December 9th, *when I asked how she found out about the roofing job.*

(August 20 Hr'g Tr. at 214-215) (emphasis added). Agent Lane also testified that Revenue Agent Bosshart "knew that the roofing job had something to do with another investigation." (*Id*. at 216.) When asked whether Revenue Agent Bosshart told him that she learned about the roofing job from testimony in a previous case, Agent Lane stated he could not recall. (*Id*. at 217.) When asked why he had written down the reference to testimony in a previous case, Agent Lane merely stated that he could not "elaborate beyond what [he had] written." (*Id*. at 198.)

This Court does not find Agent Lane's testimony credible. Agent Lane's handwritten, contemporaneous notes of the December 9 meeting directly refer to testimony in a previous case in reference to a question about how the Gervais roofing job was discovered. Agent Lane failed to explain the connection between the question and answer reflected in these notes. Agent Lane also provided inconsistent testimony, on the

one hand stating that he could not recall Revenue Agent Bosshart's response to the question about the roofing job, but on the other hand testifying that he learned about the Gervais investigation when he asked about the roofing job in the December 9 meeting and that Revenue Agent Bosshart knew that the roofing job had something to do with another investigation.  At best, Agent Lane's testimony on this point is a question mark. Where there is evidence that an investigation has become tainted by immunized testimony, the government must produce more to meet its affirmative obligation.

Agent Lane's testimony regarding the report of the Defendant's immunized proffer statement also fails to adequately support the government's case.  The Defendant's case was Agent Lane's first assignment when he became an IRS agent.  The exhibits received by this Court show that Agent Lane conducted an extremely thorough investigation of the Defendant and Sieco.  The main focus of Agent Lane's investigation was the Defendant's deduction of personal expenses on Sieco's tax return, not the Defendant's unreported income.  Yet Agent Lane interviewed nine past and present Sieco employees in his effort to substantiate the Defendant's failure to report $3,500 in income from the Gervais roofing job.  (*Id.* at 224.)

Agent Lane testified that when he received reports of the Defendant's statements to a fellow agent, specifically requested in order to interview Gervais about this aspect of the case that he had been unable to pin down, he never read them.  He testified he did not read them at the time he received them or at any time thereafter though they sat in his possession for months.  Agent Lane pursued this investigation with some intensity, and

16

foregoing an opportunity to read statements made by the Defendant is inconsistent with Agent Lane's other conduct during his investigation.  The Court finds Agent Lane's testimony that he did not read the report containing immunized statements not to be credible.[9]  The Court finds it similarly unlikely that Agent Lane never read the immunity letter, which he received from Revenue Agent Bosshart at the very beginning of his investigation and which is only a single page, though he testified as to this as well.

The Court concludes that the government has not shown, whether by clear and convincing evidence or by a preponderance of the evidence, that the Defendant's immunized statements were unknown to Agent Lane and that he was not influenced by them during his investigation.  The evidence, in fact, suggests otherwise.  The Defendant's prosecution will, therefore, be derailed by an immunity problem concerning a $3,500 item, even though that the indictment was based on extensive investigatory efforts and ultimately alleged a pattern of tax evasion spanning several years that concerned a much greater amount of money.  This result was avoidable; it arose at least in part because the IRS has no system for segregating or sealing immunized information.  While it may seem a bitter pill given the totality of the evidence of the Defendant's tax fraud amassed by the IRS, the Court dismisses the indictment against the Defendant.

---

[9]     The government admitted at the hearing that if the Court believed Agent Lane read the report regarding the proffer meeting, it would be fatal to the government's case. (August 20 Hr'g Tr. at 265.)  ("I think that is probably fatal to the Government's case. Because I think that would be a non-evidentiary use of the immunized testimony.")

**CONCLUSION**

The government has failed to meet its burden to show that the Defendant's immunized statements were not used during the investigation leading to the indictment against him.  Therefore, the Court makes the following:

**ORDER**

1.      The motion to dismiss the indictment of Defendant Jeffrey A. Siewert (Doc. No. 14) is **GRANTED.**

2.      The Defendant's Motion to Suppress Seized Property (Doc. No. 16), Motion to Suppress Derivative Evidence (Doc. No. 19), Motion to Suppress Statements (Doc. No. 18), and Motion to Suppress Wiretapping Evidence (Doc. No. 47) are **DENIED** as moot.

3.      The indictment is **DISMISSED WITH PREJUDICE**.


Dated:  October 17, 2008              s/Donovan W. Frank
                                      DONOVAN W. FRANK
                                      Judge of United States District Court